**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

| | |
|---|---|
| **ROBERT FABIAN, individually and** ) | |
| **behalf of others similarly situated,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 09-2305-STA-dkv** |
| ) | |
| **FULMER HELMETS, INC. and** ) | |
| **DOES 1-10,** ) | |
| ) | |
| **Defendants.** ) | |

_____

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**
_____

Before the Court is Defendant Fulmer Helmets, Inc.'s Motion to Dismiss the Amended

Complaint (D.E. # 10) filed on July 2, 2009.  Plaintiff has responded in opposition to the

Motion.[1]  Defendant has filed a reply brief.  For the reasons set forth below, the Motion is

**GRANTED**.[2]

**BACKGROUND**

According to the Amended Complaint, this action seeks money damages for Tennessee

state claims arising out of Defendant's deceptive marketing and sale of "AF-50", "Trooper", and

---

[1] Plaintiff's response brief was thirty-six (36) pages in length.  Pursuant to Local Rule 7.2(e), "Memoranda in support of or in opposition to motions shall not exceed twenty pages without prior court approval, including the statement of facts."

[2] In light of the filing of Plaintiff's Amended Complaint, Defendant's initial Motion to Dismiss the original complaint is **DENIED** as moot.

1

"AF-50 Trooper" motorcycle helmets ("the AF-50 helmets") by Defendant Fulmer Helmets, Inc. ("Fulmer"). Am. Compl. ¶ 1. The AF-50 helmets were manufactured for Fulmer in Taiwan, and were distributed in the U.S. by Fulmer to non-party motorcycle specialty stores for sale to end-use consumers like Plaintiff. *Id*. In August 2002, some of the AF-50 helmets selected at random failed a key safety test performed by an independent laboratory chosen by the U.S. National Highway Traffic Safety Administration ("NHTSA"). *Id*. at ¶ 2. The laboratory also determined that a small sticker Fulmer placed on the AF-50 helmets to represent that they were "DOT approved" (*i.e*. complied with applicable Department of Transportation safety requirements) was not placed on the helmet in accordance with applicable regulations. *Id*. Despite knowing that the AF-50 helmets failed the applicable safety test and were improperly labeled, Fulmer nevertheless continued to deceptively represent, market, and sell such helmets as if they were DOT-approved by among other things affixing "DOT approved" stickers to the helmets and promoting them as "DOT approved" on its internet website and online catalogues. *Id*.

No more material representation can be made about a motorcycle helmet than that it is "DOT-approved." *Id*. at ¶ 3. This statement sends a clear message to consumers that the manufacturer of a helmet certifies it as meeting all applicable federal safety standards. *Id*. In purchasing the AF-50 helmets, Plaintiff and the class members reasonably and justifiably relied on Fulmer's material misrepresentations that such helmets were "DOT approved" and thus met all applicable federal safety standards. *Id*. In reality, these helmets should not have been labeled "DOT approved" because they had not passed all of the NHTSA-sponsored tests and/or criteria, and thus did not afford the safety or protection to Plaintiffs and class members implied by Fulmer's misrepresentations. *Id*. Plaintiff and members of the class would not have paid

anything for the AF-50 helmets that posed a health risk by exposing them to a heightened peril of serious physical injury.  *Id*.  Since Plaintiff and class members did not receive the product Fulmer promised them, they did not obtain the benefit of their bargain with Fulmer.  *Id*. Fulmer's misconduct damaged Plaintiff and the Class members by, among other things, causing them to purchase an unsafe helmet that did not conform to Fulmer's representations, thus exposing them to a heightened risk of serious physical injury or death.  *Id*. at ¶ 4.

Plaintiff Robert Fabian is a citizen and resident of the Commonwealth of Pennsylvania. *Id*. at ¶ 7.  Plaintiff purchased two AF-50 helmets for personal and household use from an authorized Fulmer dealer in Pennsylvania.  *Id*.  Plaintiff intends to seek class status under the provisions of Rule 23, Tennessee Rules of Civil Procedure on behalf of a class as defined hereinafter.  *Id*.

Defendant Fulmer Helmets, Inc. is a for-profit Tennessee domestic corporation with its home office located in Memphis, Tennessee.  *Id*. at ¶ 8.  For over thirty years, Fulmer has engaged in the design, manufacture, marketing, distribution, and sale of motorcycle helmets from its headquarters in the State of Tennessee through a nationwide network of authorized Fulmer dealers.  *Id*.  Fulmer has also entered into one or more manufacturing agreements with non-party Kim Yong Lung Industrial Company, Ltd. ("KYL"), a Taiwanese manufacturer of motorcycle helmets.  *Id*.

Federal regulations issued by NHTSA establish minimum performance standards for every motorcycle helmet sold in the United States.  *Id*. at ¶ 9.  Federal Motor Vehicle Safety Standard No. 218 ("FMVSS 218"), 49 C.F.R. § 571.218, provides that a motorcycle helmet must be able to pass different types of tests designed to evaluate its structural integrity and its ability

3

to protect the wearer. *Id*. Fulmer's website, www.fulmerhelmets.com/FAQ_List.aspx, explains that its helmets are required to meet the minimum safety standards provided in FMVSS 218:

> What is DOT?
>
> DOT is the Federal Government's Department of Transportation (DOT). DOT sets minimum standards that all helmets sold for motorcycling on public streets must meet. The standard is Federal Motor Vehicle Safety Standard 218 (FMVSS 218) and is known commonly as the DOT standard.
>
> *Id*.

Among other things, FMVSS 218 requires motorcycle helmets to be tested to determine the extent to which they can withstand penetration and attenuate the force of an impact. *Id*. at ¶ 10. In the FMVSS penetration test, a helmet is mounted on a form and a "penetration test striker" weighing 3 kilograms is dropped in a "guided free fall" of three meters, measured from the striker point to the impact point on the outer surface of the test helmet. *Id*. Two blows to the test helmet are so applied within four minutes of each other to points on the helmet located at least 7.6 centimeters from the centers of any impacts applied during the impact attenuation testing. *Id*. In the FMVSS 218 impact attenuation test, "impact attenuation is measured by determining acceleration imparted to an instrumented test headform on which a complete helmet is mounted. . . when it is dropped in guided free-fall upon a fixed hemispheric anvil and a fixed flat steel anvil." *Id*.

Helmet manufacturers must make an initial determination as to whether their helmets comply with FMVSS 218. *Id*. at ¶ 11. If and when a manufacturer decides that a helmet meets such standards, FMVSS 218 requires the manufacture to affix a label to the helmet that states

4

"DOT."  *Id*.  This label constitutes the manufacturer's certification that the helmet complies with all applicable federal safety standards.  *Id*.  NHTSA itself does not certify helmets, as its Chief Counsel plainly stated in March 1999: "NHTSA neither approves, disapproves, endorses, tests, nor grants clearances for products prior to their introduction into the retail market."  *Id*.  Instead, NHTSA monitors the propriety of the manufacturer self-certification process by randomly purchasing motorcycle helmets and sending those helmets to independent testing labs.  *Id*.  These labs conduct specific, NHTSA-approved tests to determine whether the helmets meet NHTSA's FMVSS 218 requirements.  *Id*.  NHTSA posts these test results on its website.  *Id*.

In 2000, NHTSA randomly selected certain AF-50 helmets and sent them to SGS U.S. Testing Company Inc. for testing.  *Id*. at ¶ 12.  In a report dated May 30, 2000, published by NHTSA under HS No. 634817, these helmets were found to have met the FMVSS 218 requirements, although the report explained that the helmets' "[r]etention system elongation exceeded 1 inch in the wet condition."  *Id*.

In 2002, NHTSA again randomly selected certain AF-50 helmets and sent them to the Head Protection Research Laboratory for testing.  *Id*. at ¶ 13.  In a report dated August 19, 2002, published by NHTSA under HS No. 636296, these helmets were found to have failed the applicable impact attenuation test and the labeling requirement: "The helmets failed performance requirement S5.1(b) accelerations in excess of 200g shall not exceed a cumulative duration of 2.0 milliseconds (one dwell time failure)" and "[t]he helmets failed labeling requirement S5.6.1(e): 'DOT' symbol placement (too high on rear of helmet)."  *Id*.

Following the release of this test report, Fulmer knew that its AF-50 helmets did not meet FMVSS 218 standards, failed the impact attenuation test, were not being delivered to consumers

in "DOT approved" condition as promised, were less safe than helmets that passed all applicable NHTSA tests, and were improperly labeled. *Id*. at ¶ 14. Nevertheless, following the release of this test report, Fulmer took no steps to notify consumers that the AF-50 helmets failed to meet all of the applicable FMVSS 218 standards, revise or remove the "DOT approved" label from the AF-50 helmets, change its marketing representations concerning DOT approval of the AF-50 helmets, or improve the safety of its helmets. *Id*.

Despite knowing about the results of the 2002 testing for the AF-50 helmet, Fulmer nevertheless continued to place "DOT approved" labels on the AF-50 helmets that it distributed and to expressly (and falsely) say that these helmets were "DOT approved" on Fulmer's website, catalogues, and in other materials – all of which represented to Plaintiff and members of the Class that Fulmer certified that such helmets met applicable safety standards. *Id*. at ¶ 15. From 2002 on, Fulmer knew that these representations were false. *Id*. Further, to avoid adverse publicity and minimize the economic impact of admitting this problem, Fulmer refused to do anything that would help consumers learn about the problems with the helmets. *Id*. at ¶ 16. For example, Fulmer did not send a notice advising purchasers that the AF-50 helmets failed the FMVSS 218 test, cause this information to be posted by retailers, or implement any recall relating to the helmets. *Id*. Instead, Fulmer continued to manufacture, market, distribute, and sell the falsely labeled AF-50 helmets throughout the United States, and to knowingly and uniformly misrepresent the helmets as "DOT approved." *Id*. at ¶ 17. In so doing, Fulmer intentionally and negligently misrepresented material information about the helmets to consumers, breached their warranty, and received funds to which it was not entitled – all while ignoring that its conduct unreasonably placed consumers at an increased risk of serious injury

6

and preventing consumers from obtaining what they reasonably expected from the AF-50 helmets because of Fulmer's deceptive marketing and false labels. *Id.*

In a section titled "Active Concealment/Equitable Tolling," the Amended Complaint alleges that at all relevant times, Defendant actively concealed the fact that the AF-50 helmets did not meet FMVSS 218 standards, failed the impact attenuation test, and were not being delivered to consumers in "DOT approved" condition as promised. *Id.* at ¶ 18. Defendant accomplished this goal by continuing to place "DOT approved" labels on the AF-50 helmets it distributed, continuing to represent the helmets as "DOT approved" on Fulmer's website, catalogues, and other materials, and failing to make any corrective public statements concerning the helmets' approval status. *Id.*

Plaintiff purchased two AF-50 helmets in July 2004. *Id.* at ¶ 19. In early 2007, Plaintiff sold one of his AF-50 helmets to a personal friend, Mark Walter. *Id.* In June 2007, Mr. Walter was involved in a motorcycle accident while wearing the AF-50 helmet he purchased from Plaintiff and died from severe brain trauma and other injuries. *Id.* As a result of the subsequent investigation conducted by Mr. Walter's attorneys, Plaintiff first learned in early 2008 that the AF-50 helmets he bought had failed FMVSS 218 testing as alleged above. *Id.* Plaintiff did not know about the facts and issues alleged herein – including Defendants' efforts to conceal the helmets' failure of NHTSA-mandated testing – and could not have discovered this information through the exercise of reasonable diligence until early 2008. *Id.* at ¶ 20. As a result of Defendants' active concealment of the relevant information and issues, any and all applicable statutes of limitations have been tolled. *Id.* at ¶ 21. Alternatively, the helmets' defect is essentially self-concealing, such that the applicable statute of limitations should be considered

tolled for all consumers.  *Id*.

In a section titled "Plaintiff's and the Class Members' Damages," the Amended Complaint alleges that on July 22, 2004, Plaintiff purchased two AF-50 helmets from an authorized Fulmer retailer in Pennsylvania.  *Id*. at ¶ 22.  Plaintiff paid a retail price of $78.88 for each helmet for a total of $157.76 plus tax.  *Id*.  Given the material nature of Fulmer's misrepresentation that the AF-50 helmets were "DOT approved" – *i.e*., that Fulmer had certified such helmets to comply with applicable federal safety standards and whether they could be safely used -- Plaintiff would not have purchased such helmets if he had known that they were inappropriately certified and falsely labeled by Fulmer as complying with such standards.  *Id*.  As a direct and proximate result of Fulmer's wrongful conduct as alleged, Plaintiff and the class members were harmed and injured in that, *inter alia*, they were misled into purchasing an inferior-quality helmet that was not "DOT approved," did not meet Fulmer's representations about safety or quality, and exposed them to a heightened risk of serious physical injury.  *Id*. at ¶ 23.  But for the wrongful conduct of Fulmer as alleged, Plaintiff and the class members would not have purchased the AF- 50 helmets.  *Id*.

In a section titled "Class Action Allegations," the Amended Complaint alleges that Plaintiff brings this action on his own behalf, and as a class action under the provisions of Rule 23 of the Tennessee Rules of Civil Procedure, on behalf of a class defined to include: "All persons in the United States who purchased Fulmer 'AF-50', 'Trooper', or 'AF-50 Trooper' motorcycle helmets from August 20, 2002 to the present."  *Id*. at ¶ 24.  Expressly excluded from the class are: Fulmer and its affiliates, subsidiaries and co-conspirators; the trial judge and his or her family, any federal, state and local government purchasers, and anyone seeking to recover for

8

physical injuries suffered due to the failure of the subject helmets.  *Id*.

Plaintiff estimates that Fulmer distributed approximately 30,000 of the AF-50 helmets in the United States during the relevant period.  *Id*. at ¶ 25.  While the exact number and identity of the class members are presently unknown to Plaintiff, this information should be available to Fulmer in the regular course of its business.  *Id*.  Because of the large number and disparate location of the class members, the class is so numerous that the joinder of all its members would be impractical.  *Id*.  Since Fulmer acted on grounds generally applicable to the entire class, the following common questions of law and fact predominate over any questions pertinent to individual class members:

a. Whether Fulmer appropriately self-certified the AF-50 helmets as complying with FMVSS 218 safety standards in light of the failure of such helmets to comply with all such requirements during NHTSA-sponsored testing as alleged;

b. Whether Fulmer made a material misrepresentation to Plaintiff and members of the class in representing that its AF-50 helmets were "DOT approved";

c. Whether Fulmer considered taking, or took, any steps to notify Plaintiff or the class members that the helmets failed to demonstrate compliance with FMVSS 218;

d. Whether Fulmer violated TCA §§ 47-2-314, 47-2-315 and 55-9-302(a);

e. Whether Fulmer was unjustly enriched under the circumstances alleged; and

f. The appropriate type and/or measure of damages arising out of purchases of the helmets made by Plaintiff and the class members.

*Id*. at ¶ 26.

Plaintiff's claims are typical of the claims belonging to the absent class members.  *Id*. at ¶ 27.

All of the class members sustained similar damages as a result of Fulmer's misstatements, which were uniformly published or made available to all class members.  *Id.*  Plaintiff and the class members were damaged as a result of purchasing helmets that did not meet FMVSS 218 safety standards, as Fulmer had represented.  *Id.*  Plaintiff will fairly and adequately protect the interests of the class.  *Id.* at ¶ 28.  Plaintiff purchased the AF-50 helmets and wore them while riding a motorcycle.  *Id.*  Plaintiff shares several common, non-antagonistic goals with all class members, including the recovery of consideration that he and other members of the class paid to purchase the AF-50 helmets.  *Id.*  Plaintiff is represented by competent counsel experienced in the prosecution of class action litigation.  *Id.* at ¶ 29.  The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Fulmer.  *Id.* at ¶ 30.  The common questions of law and fact identified above predominate over any questions affecting only individual members.  *Id.* at ¶ 31.

Class action treatment is superior to other available methods for the fair and efficient adjudication of this controversy.  *Id.* at ¶ 32.  The class is readily definable and is one for which sales records exist.  *Id.*  Prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress for claims too small to support the expense of individual complex litigation.  *Id.*  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.  *Id.*

In "Count I  Fraudulent Misrepresentation," the Amended Complaint alleges that Fulmer repeatedly and publically misrepresented throughout the class period that the AF-50 helmets

were "DOT approved." *Id*. at ¶ 34. This statement appeared on a label placed on each of these helmets sold to Plaintiff and the class members, on marketing materials used to promote such helmets, on Fulmer's website, and in its catalogues. *Id*. At all times after August 19, 2002 – the date on which NHTSA published final FMVSS 218 test results for these helmets – Fulmer knew that its statements that the AF-50 helmets were "DOT approved" were false when made. *Id*. at ¶ 35. Fulmer misrepresented the AF-50 helmets as "DOT approved" intending to induce reliance from consumers. *Id*. at ¶ 36. No more material representation can be made about a motorcycle helmet than that it is "DOT approved." *Id*. This statement sends a clear message to consumers that the manufacturer of a helmet certifies it as meeting all applicable federal safety standards and as being a tested, safe, and reliable product. *Id*. In a competitive market where it was competing against other manufacturers whose helmets were truly "DOTapproved," Fulmer's intent to induce reliance is obvious. *Id*. Fulmer's "DOT approved" statements were highly material to the purchase decisions made by Plaintiff and the class members, all of whom reasonably and justifiably relied on Fulmer's statements to their detriment. *Id*. at ¶ 37. But for the deceptive representations of Fulmer as alleged herein, Plaintiff and class members would not have purchased the AF-50 helmets. *Id*. As a direct and proximate result of Fulmer's misrepresentation that the AF-50 helmets were "DOT approved," Plaintiff and the class members suffered damages as alleged herein. *Id*. at ¶ 38.

In "Count II Negligent Misrepresentation," the Amended Complaint alleges that in making the misrepresentations, Fulmer was acting in the course of its business, and in the context of a transaction in which it had a pecuniary interest, e.g., the sale of AF-50 helmets to consumer purchasers. *Id*. at ¶ 40. In making the misrepresentations, Fulmer supplied faulty

information meant to guide others in their business transaction.  *Id*. at ¶ 41.  Specifically, Fulmer

supplied information to Plaintiff and the class members that the AF-50 helmets were "DOT

approved" despite having access to NHTSA safety test results directly to the contrary.  *Id*.

Further, after learning that these helmets did not pass NHTSA-sponsored safety testing, Fulmer

continued to certify the helmets as conforming to applicable federal safety standards when they

clearly did not.  *Id*.  Fulmer also failed to take any reasonable steps to correct its misstatements

or inform Plaintiff or the class members of the true nature of such helmets.  *Id*.

Fulmer failed to exercise reasonable care in obtaining or communicating material

information about the quality and safety of the AF-50 helmets to Plaintiff and the class members,

including the fact that the helmets were not "DOT approved" as Fulmer represented.  *Id*. at ¶ 42.

Fulmer's statements that the helmets were "DOT approved" were highly material to

decisions made by Plaintiff and the class members to purchase the helmets, all of whom

reasonably and justifiably relied on such statements to their detriment.  *Id*. at ¶ 43.  But for the

deceptive  representations of Fulmer as alleged herein, Plaintiff and class members would not

have purchased the AF-50 helmets.  *Id*.  As a direct and proximate result of Fulmer's

misrepresentations that the helmets were "DOT approved," Plaintiff and the class members

suffered damages.  *Id*. at ¶ 44.

In "Count III Breach of the Implied Warranties of Merchantability and Fitness for a

Particular Purpose," the Amended Complaint alleges that Fulmer is a "merchant with respect to

goods of that kind" as required by Tenn. Code Ann. § 47-2-314 with respect to the AF-50

helmets.  *Id*. at ¶ 46.  Because the AF-50 helmets sold to Plaintiff and the class members failed

the applicable impact attenuation test (and because they failed a requirement relating to the

placement of the "DOT" symbol), they contained an actual, material defect that made them unmerchantable at the time of sale or delivery and unfit for the ordinary purposes for which they were intended.  *Id*. at ¶ 47.  The helmets' key defect, the inability to properly protect the user against impact, was present and manifest in all of the subject helmets as demonstrated by the unfortunate death of Plaintiff's friend, Mr. Walter, in a motorcycle accident while wearing an AF-50 helmet.  *Id*. at ¶ 48.  Motorcycle riders wear a helmet for only one purpose: to protect against head trauma.  *Id*. at ¶ 49. Fulmer breached the warranty of merchantability because the AF-50 helmets failed the applicable impact attenuation test and, thus, were not able to properly protect their owners against impact, essentially depriving Plaintiff and the class members of their beneficial use of the helmets they bought for that purpose.  *Id*.  As a result, Fulmer is liable to Plaintiff and the class members for breaching the implied warranties of merchantability and fitness for a particular purpose under Tenn. Code Ann. §§ 47-2-314 and 47-2-315.  *Id*. at ¶ 50.

In "Count IV Unjust Enrichment," the Amended Complaint alleges that Plaintiff and the class members conferred an economic benefit on Fulmer by their purchases of the AF-50 helmets because Fulmer received money from sale even if Fulmer was not the actual end-seller of a given helmet.  *Id*. at ¶ 52.  Fulmer appreciated, accepted, and retained this economic benefit to the detriment of Plaintiff and the class members.  *Id*. at ¶ 53.  Allowing Fulmer to retain the economic benefit it received from AF-50 helmet sales would be inequitable to Plaintiff and the class members because of Fulmer's wrongful conduct.  *Id*. at ¶ 54.  Fulmer's retention of the economic benefit it received violates the fundamental principles of justice, equity and good conscience because Fulmer knowingly and intentionally misrepresented the nature and quality of the helmets, knowingly sold Plaintiff and the Class members a defective product that did not

13

offer the promised level of protection and refused to make corrective statements once it became aware of the truth.  *Id*.  As a result, Plaintiff seeks an order requiring Fulmer to disgorge all of the profits, benefits, and other compensation they obtained from the Class members as a result of its wrongful conduct.  *Id*. at ¶ 55.

In its Motion to Dismiss the Amended Complaint, Defendant argues that Plaintiff's Amended Complaint should be dismissed for failure to state a claim.  The safety regulations cited in the Amended Complaint do not provide a cause of action for their enforcement. According to Defendant, the helmet in question failed one out of thirty-two (32) different impact tests during the August 2002 testing.  Despite those results, the NHTSA never determined that any corrective action was warranted.  More importantly, only the NHTSA has the authority to order Defendant to take such action, and so Plaintiff has no standing to use the results of the testing to bring his claims.  Plaintiff's claims are an impermissible *de facto* enforcement action under the Federal Motor Vehicle Safety Act.  An injured private party is not authorized to bring a private cause of action to enforce the Federal Safety Act.  Defendant argues that as an uninjured private party, Plaintiff's only remedy under the federal regulatory scheme is to petition the NHTSA for a defect investigation and recall.

Furthermore, Defendant contends that Plaintiff has failed to allege any injury to himself or to those he seeks to represent.  Plaintiff seeks only a refund of the two helmets he purchased. Plaintiff has not alleged a personal injury to himself or any economic loss.  In fact, Plaintiff excludes from his putative class any individual who suffered a personal injury as a result of using the helmets at issue.  Under Tennessee law, damages are an essential element of a claim for fraud or misrepresentation.  Finally, Defendant argues that Plaintiff has failed to allege a

claim for unjust enrichment.  Plaintiff has failed to allege that he conferred some benefit on Defendant because Defendant sold the helmets to an unnamed retailer in Pennsylvania, not Plaintiff himself.  Plaintiff also may not seek restitution for the price of the helmets because the claimed defect in the helmets had not manifested.

Finally, Defendant argues that all of Plaintiff's claims are time-barred.  Plaintiff has alleged that he purchased two of the helmets sold by Defendant on July 22, 2004.  However, the Amended Complaint also alleges that the results of the failed impact test were public record for two years at the time Plaintiff purchased his two helmets.  Plaintiff did not file his original Complaint in this case until April 2, 2009.  Defendant contends that Plaintiff has failed to allege that Defendant actively concealed any material fact about the helmets.  The impact test results were public records, and Defendant did nothing to withhold the information.  Therefore, Defendant asks the Court to dismiss Plaintiff's Amended Complaint.

Plaintiff has responded in opposition arguing that under the relevant standard of review for pleadings, the Amended Complaint has properly stated the claims alleged.  Plaintiff argues that the Federal Safety Act does not preempt his state law claims and asserts that the Act permits actions at state common law.  In fact, Plaintiff does not seek a remedy under the Act.  According to Plaintiff, his state law claims are not based on the fact that Defendant's helmet failed a government safety test.  Rather, Plaintiff has alleged that Defendant had knowledge of this failure and then made the "conscious decision to represent, market and sell the AF-50 helmets as if they had passed the FMVSS 218 tests and merited certification as 'DOT approved' when, in fact, the helmets had not passed such tests and should not have been so certified."  As for the damages, Plaintiff argues that he has clearly alleged that he purchased two of Defendant's

helmets and would not have done so had he known that the helmets did not meet federal safety standards.  According to Plaintiff, the helmets are "un-merchantable and valueless."  Plaintiff asserts that he need not allege personal injury in order to have a cognizable claim for damages.  As for his unjust enrichment claim, Plaintiff argues that his purchase of Defendant's helmets clearly conferred a benefit on Defendant even though the helmet was sold by one of Defendant's authorized dealers, not Defendant itself.  Likewise, Defendant received a benefit in the form of profits from the sale of the helmets purchased by Plaintiff and others.

Finally, Plaintiff argues that his claims are timely and that the Court should not consider this argument at the pleadings stage.  The statute of limitations under Tennessee law for Plaintiff's misrepresentation claims was three years.  Plaintiff argues that his cause of action did not accrue until early 2008 when Plaintiff learned that his friend had died in a motorcycle accident while wearing one of Defendant's defective helmets.  Plaintiff alleges in his Amended Complaint that he could not have discovered the defective condition of the helmets sooner and that the discovery of his injury is a question of fact.  Additionally, Plaintiff's unjust enrichment claim was timely under Tennessee's six-year statute of limitations.

In Defendant's reply brief, Defendant reiterates that a private person has no cause of action to enforce a federal safety regulation.  According to Defendant, Plaintiff is effectively arguing that the failed safety test in 2002 created a duty in Defendant to take action and correct the helmet.  Defendant goes on to repeat its contention that Plaintiff has failed to allege an injury in so far as the helmets have never been shown to malfunction.  Defendant argues that Plaintiff's unjust enrichment claim is actually governed by the UCC.  As for the statute of limitations, Defendant contends that Tennessee does not recognize the doctrine of equitable tolling.

Defendant restates its argument that the 2002 testing on the helmets is a matter of public record and so Plaintiff cannot claim that he did not discover the results until 2008.  The discovery rule does not apply to save any warranty claims.

## **STANDARD OF REVIEW**

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the complaint as true and construe all of the allegations in the light most favorable to the non-moving party.[3]  However, legal conclusions or unwarranted factual inferences need not be accepted as true.[4]  "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[5]  "The Federal Rules of Civil Procedure do not require a claimant to set out in detail all the facts upon which he bases his claim."[6]

The Supreme Court has more recently stated that the Federal Rules "do not require a heightened fact pleading of specifics, but only enough facts to state a claim that is plausible on

---

[3]  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992).

[4] *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

[5] *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 889, 902 (6th Cir. 2003).

[6] *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

its face."[7]  The Sixth Circuit has subsequently acknowledged "[s]ignificant uncertainty" as to the

intended scope of *Twombly*.[8]  Consequently, the Sixth Circuit has articulated the following as the

standard of review for 12(b)(6) motions: on a motion to dismiss, the Court must construe the

complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and

determine whether the complaint contains "enough facts to state a claim to relief that is plausible

on its face."[9]  Thus, although the factual allegations in a complaint need not be detailed, they

"must do more than create speculation or suspicion of a legally cognizable cause of action; they

must show entitlement to relief."[10]

## ANALYSIS

Under the *Erie* doctrine, in cases where a federal court exercises jurisdiction by virtue of

the diversity of the parties, the federal court is bound to apply the substantive law of the forum

state as if the action had been brought in a state court of the jurisdiction where the federal court

is located.[11]  The federal court must apply the law as it has been determined by the highest court

---

[7] *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007) ("retiring" the "no set of facts" standard first announced in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).  *See also Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

[8] *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir.2007); *see also Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 337 (6th Cir.2007) ("We have noted some uncertainty concerning the scope of *Bell Atlantic Corp. v. Twombly*, ... in which the Supreme Court 'retired' the 'no set of facts' formulation of the Rule 12(b)(6) standard ....").

[9] *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Twombly*, 127 S.Ct. at 1974 (2007)).

[10] *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir.2007) (emphasis in original) (citing *Twombly*, 127 S.Ct. at 1964-65).

[11] *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007).

of that state.[12]  When the highest court of the forum has not answered a particular question of

law, the federal court must discern or predict how the state courts would respond if confronted

with the question.[13]  The federal court must ascertain from all available data what the law is and

apply it.[14]  In the absence of any indication that the state's highest court would adopt a rule

contrary to the rule announced in an intermediate appellate court, a federal court is not free to

ignore the announcement of a state appellate court on matters of state law.[15]

## I.      National Highway Transportation Safety Agency regulations

Defendant argues in effect that Plaintiff's state law tort claims are "a *de facto*

enforcement action" of the Federal Safety Act.  In other words, Defendant argues that federal

law has pre-empted state tort law claims such as those alleged in Plaintiff's Amended Complaint.

The doctrine of pre-emption derives from the Supremacy Clause of the United States

Constitution, which reads "[t]his Constitution, and the Laws of the United States which shall be

made in Pursuance thereof ... shall be the supreme Law of the Land ..., any thing in the

Constitution or Laws of any State to the Contrary notwithstanding."[16]  The Court's task is to

ascertain the intent of Congress in order to determine whether federal law has pre-empted state

---

[12] *Gahafer v. Ford Motor Co.,* 328 F.3d 859, 861 (6th Cir. 2003).

[13] *Hartford Fire Ins. Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy,* 740 F.2d 1362, 1365 (6th Cir. 1984); *Clutter v. Johns-Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir. 1981).

[14] *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601 (6th Cir. 1985).

[15] *Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676 (6th Cir. 2000).

[16] U.S. Const. art. VI, cl. 2; *California Sav. and Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987).

law making the state law invalid under the Supremacy Clause.[17]  Congressional intent may be found in federal regulations duly enacted pursuant to delegation of congressional authority.[18]

Federal pre-emption of state law is evidenced in three possible ways.[19]  First, Congress may expressly pre-empt state law, so-called express pre-emption.[20]  Second, an entire field of state regulation may be impliedly pre-empted by its distinctly federal nature or by the presence of sufficiently comprehensive congressional regulation, that is, implied field pre-emption.[21] Third, state law is pre-empted to the extent it actually conflicts with federal law, which occurs if compliance with both laws is not possible or if compliance with state law impedes attainment of the objectives underlying federal law, i.e., implied conflict pre-emption.[22]  There are thus three types of pre-emption under federal law: express pre-emption, implied field pre-emption, and implied conflict pre-emption.[23]

Plaintiff's tort claims are based on the alleged unsafe condition of Defendant's AF-50

---

[17] *Guerra,* 479 U.S. at 280, 107 S.Ct. at 689.

[18]  *Hillsborough County v. Automated Medical Labs., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (citing examples).

[19] *Guerra,* 479 U.S. at 280-81, 107 S.Ct. at 689 (identifying three types of pre-emption); *Hillsborough County,* 471 U.S. at 712, 105 S.Ct. at 2375 (same).

[20] *Guerra,* 479 U.S. at 280, 107 S.Ct. at 689; *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375.

[21] *Guerra,* 479 at 280-81, 107 S.Ct. at 689; *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375.

[22] *Guerra,* 479 at 281, 107 S.Ct. at 689; *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375.

[23] *King v. Ford Motor Co.*, 209 F.3d 886, 891 (6th Cir. 2000).

helmets.  According to the Amended Complaint, the helmets failed a government-mandated

safety test conducted in 2002.  Nevertheless, Defendant affixed a label with the letters "DOT" to

the helmets certifying that they were safe and complied with government standards and

continued to put the helmets on the market.  The federal regulation on motorcycle helmets, 49

C.F.R. § 571.218, prescribes certain labels for motorcycle helmets.[24]

> Each helmet shall be labeled permanently and legibly, in a manner such that the label(s) can be read easily without removing padding or any other permanent part, with the following:
>
> (a) Manufacturer's name or identification.
> (b) Precise model designation.
>
> (c) Size.
> (d) Month and year of manufacture. This may be spelled out (for example, June 1988), or expressed in numerals (for example, 6/88).
> (e) The symbol DOT, constituting the manufacturer's certification that the helmet conforms to the applicable Federal motor vehicle safety standards.  This symbol shall appear on the outer surface, in a color that contrasts with the background, in letters at least 3/8 inch (1 cm) high, centered laterally with the horizontal centerline of the symbol located a minimum of 1 1/8 inches (2.9 cm) and a maximum of 1 3/8 inches (3.5 cm) from the bottom edge of the posterior portion of the helmet.[25]

Defendant argues that Plaintiff cannot bring the state law tort claims alleged in the Amended

Complaint because the Safety Act permits only the Attorney General to file suit to enforce the

Act.  Thus, compliance with state law in this case would essentially "impede attainment of the

objectives underlying federal law," making this a case of implied conflict pre-emption.  It is true

that the Safety Act authorizes only the Attorney General to bring a civil action in federal district

court to enjoin a violation of the Act or a regulation promulgated under the Act or the sale of any

---

[24] 49 C.F.R. § 571.218, S5.6.

[25] *Id.*

product which does not comply with the Act.[26]  The Act further provides civil penalties for violations of the Act or its implementing regulations in the form of fines up to $15 million.[27] The Court holds that based on these provisions, any suit for injunctive relief or damages for violations of the Act is pre-empted.

Nevertheless, the Safety Act contains its own pre-emption clause defining the scope of the Act:

> When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter.  However, the United States Government, a State, or a political subdivision of a State may prescribe a standard for a motor vehicle or motor vehicle equipment obtained for its own use that imposes a higher performance requirement than that required by the otherwise applicable standard under this chapter.[28]

At the same time, the statute specifically limits the scope of its pre-emption of state law in two respects.  First, the statute contains the following saving clause: "Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law."[29]  The Supreme Court has construed the Safety Act's saving clause to remove "tort actions from the scope of the express pre-emption clause."[30]  Second, the statute makes it

---

[26] 49 U.S.C.A. § 30163(a).

[27] § 30165(a).

[28] 49 U.S.C.A. § 30103(b)(1).

[29] § 30103(e).

[30] *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 869, 120 S.Ct. 1913 (2000). The *Geier* Court cited the Safety Act as 15 U.S.C. § 1392 throughout but noted that this was the pre-1994 version of the statute, which had been re-codified at 49 U.S.C. § 30101 *et seq.*  *Geier*,

clear that particular sections of the statute "do not establish or affect a warranty obligation under

a law of the United States or a State" and "[a] remedy under [the specified] sections. . . of this

title is in addition to other rights and remedies under other laws of the United States or a State."[31]

Therefore, the Court holds that as a general matter, the Federal Safety Act does not pre-empt all

claims sounding in common law, including state common law torts.

Although the Act does not expressly pre-empt state tort law claims, the Supreme Court

has concluded that an implied conflict might arise where a "jury-imposed safety standard [in a

state tort suit] actually conflicts with a federal safety regulation."[32]  Here the issue before the

Court then is whether a state law claim based upon Defendant's use of the DOT sticker on its

AF-50 helmets "would stand as an obstacle to the accomplishment of [an] objective" of the

federal regulation requiring motorcycle manufacturers to affix the DOT sticker to all motorcycle

helmets.[33]  The objective of the DOT sticker regulation is clear from the language of the

regulation itself: the DOT sticker "constitut[es] the manufacturer's certification that the helmet

conforms to the applicable Federal motor vehicle safety standards."  Courts have referred to this

as the manufacturer's "self-certification."[34]

_____

529 U.S. at 865.

[31] § 30103(d).

[32] *Geier*, 529 U.S. at 871.

[33] *See Id*. at 886 (holding that petitioners' claim that all cars must have an airbag pre-empted by federal safety regulations because such claim would be an obstacle to Congress' intent that automakers utilize "a gradually developing mix of alternative passive restraint devices for safety-related reasons," which included but did not require the use of an airbag).

[34] *E.g. Bianco v. California Highway Patrol*, 24 Cal. App. 4th 1113 (Cal. Ct. App. 1994).

23

In this case, Plaintiff has alleged tort claims for intentional misrepresentation, negligent misrepresentation, breach of the implied warranties of merchantability and fitness for a particular purpose, and unjust enrichment.  The Court holds that none of these state law claims would present an obstacle to the federal objective of "self-certification."  The federal regulation requires the DOT sticker on all helmets as part of the overall safety testing protocol for motorcycle helmets.  The sticker amounts to a certification not from the Department of Transportation but from manufacturers like Defendant that their helmets have complied with DOT safety regulations.  The "self-certification" is tantamount to a representation as to the safety of a helmet.  The specific state law tort claims alleged by Plaintiff concern the accuracy of the representation.  Plaintiff's claims do not implicate the standard itself or call on a court or jury to decide whether Defendant had a duty that would present a conflict with the regulation.  The question is whether the Defendant's self-certification was a misrepresentation to consumers like Plaintiff about the safety of the AF-50 motorcycle helmet.  Tort liability based on the false representations of safety by Defendant, like contract liability based on the same, "arises under standards established by the manufacturer's representations alone."[35]  To the extent that Plaintiff's claims are based on Defendant's affirmative misrepresentations, Plaintiff can maintain an action for intentional and negligent misrepresentation as well as unjust enrichment consistent with the Supremacy Clause.  Because the misrepresentation and unjust enrichment claims do not present a conflict with the sticker regulation, the Court holds that Plaintiff's claims are not pre-empted by federal law or regulation.

---

[35] *Martin v. Ford Motor Co.*, 914 F. Supp. 1449, 1454 (S.D. Tex. 1996) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 527-29, 112 S. Ct. 2608, 120 L.Ed.2d 407 (1992)).

The implied warranty claims present a slightly difference analysis.  A claim for breach of an implied warranty does not arise from a manufacturer's promise or representation alone. Rather, an implied warranty arises strictly by operation of state law, in this case the law of the State of Tennessee.[36]  It follows that Tennessee's law of implied warranty might require a manufacturer to exceed the federal standards in order to avoid liability resulting in a potential conflict.  Therefore, the Court holds that Plaintiff's implied warranty claims are not pre-empted only to the extent that each implied warranty does not require a manufacturer such as Defendant to exceed applicable federal standards in order to avoid liability.

## II.    Failure to State a Claim

To the extent that the Federal Safety Act and its regulations do not pre-empt Plaintiff's claims, the Court holds that Plaintiff has failed to state his claims in his Amended Complaint. Plaintiff's claims are predicated on the allegation that Defendant materially misrepresented the condition of its AF-50 helmets by continuing to sell them with the DOT sticker after the helmets failed a government-mandated safety test in August 2002.  However, the Court finds that helmets like those purchased by Plaintiff were not part of the August 2002 testing.  Therefore, Plaintiff cannot make out any of his claims for misrepresentation about the helmets he purchased.

According to the Amended Complaint, the NHTSA randomly selected certain AF-50 helmets and sent them to SGS U.S. Testing Company Inc. for testing in 2000.  Am. Compl. at ¶ 12.  In a report dated May 30, 2000, published by NHTSA under HS No. 634817, these helmets

---

[36] *See Cipollone*, 505 U.S. 504, 525-26.

25

were found to have met the FMVSS 218 requirements.  *Id*.[37]  The Amended Complaint also

refers to a second round of testing in August 2002 where the helmets were found to have failed

the applicable impact attenuation test and the labeling requirement.  *Id*. at ¶ 13.  According to

Plaintiff, Defendant knew after the August 2002 tests that its AF-50 helmets did not meet

FMVSS 218 standards and still continued to certify them as DOT compliant.  *Id*. at ¶ 14.

Plaintiff purchased two AF-50 helmets in July 2004.  *Id*. at ¶ 19.   In its Motion, Defendant

argues that the helmets tested in August 2002 were AF-50 helmets, size small; whereas, Plaintiff

purchased two large AF-50 helmets.  The Amended Complaint does not allege what size helmet

Plaintiff purchased, yet Plaintiff admits in his response brief that he did purchase size large

helmets.[38]

     Although Plaintiff did not attach a copy of the testing reports to the Amended Complaint,

Defendant has produced copies of each as exhibits to its Motion to Dismiss.  Normally, the Court

may not consider matters outside of the pleadings when considering a Rule 12(b)(6) motion such

as the instant Motion without converting the motion to one for summary judgment under Rule

56.  Nevertheless, documents that a defendant attaches to a motion to dismiss are considered part

of the pleadings if they are referred to in the plaintiff's complaint and are central to the claims.[39]

_____

[37] The Amended Complaint also notes that the helmets' "[r]etention system elongation
exceeded 1 inch in the wet condition" in the 2000 testing.  Am. Compl. ¶ 12.

[38] Pl.'s Resp., 6 n. 2.  "Fulmer repeatedly refers to the size differential between Plaintiff's
helmets and a test helmet, implying that the difference somehow matters. At best, this involves a
factual dispute more appropriate for later resolution."  For the reasons that follow, the Court
disagrees.

[39] *Weiner*, 108 F.3d at 89 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987
F.2d 429, 431 (7th Cir. 1993)).

The Court findss that the testing reports are referred to extensively in Plaintiff's Amended Complaint and are central to Plaintiff's claims.  Plaintiff has not presented any reason for the Court to conclude that the reports Defendant has attached are inaccurate or otherwise unreliable.  Thus, it is appropriate to consider the testing reports at the pleading stage.

A copy of the report dated May 30, 2000, and titled "Final Report of FMVSS No. 218 Compliance Testing of Model: Fulmer Trooper Motorcycle Helmet" indicates that the testing was conducted on a size large model of the Fulmer helmet.[40]  The Amended Complaint concedes that the helmets, which were size large, in the May 2000 test satisfied the FMVSS 218 requirements.  Plaintiff further concedes that he purchased two large helmets.  Plaintiff bases his claims against Defendant, however, on alleged safety failures in a subsequent test conducted in August 2002.  A copy of the report dated August 19, 2002, and titled "Final Report of FMVSS No. 218 Compliance Testing of Brand/Model: Fulmer/AF-50 Motorcycle Helmet" indicates that the testing was conducted on a size small model of the Fulmer helmet.[41]  The Court finds that Plaintiff did not purchase helmets similar in all respects to the helmets which allegedly failed the August 2002 testing forming the basis for Plaintiff's claims about the condition of the helmets.  Therefore, the Court finds that Plaintiff has failed to state plausible claims against Defendant for any representations about the condition of the AF-50 helmets size large like the ones purchased by Plaintiff.

---

[40] Def.'s Mot. to Dismiss, ex. C.

[41] Def.'s Mot. to Dismiss, ex. B.

III.     **Statute of Limitations**

Even if Plaintiff had plausibly alleged his claims for breach of the implied warranties, the Court holds that those claims are now time-barred.  Tenn. Code Ann. § 47-2-725 provides: "An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued."[42]  As for when such claims accrue, the statute goes on to state that

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a  warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.[43]

In the Amended Complaint, Plaintiff alleges that he purchased two AF-50 helmets in July 2004. Am. Compl. ¶ 19.  Plaintiff also alleges that "[b]ecause the AF-50 helmets sold to Plaintiff and the Class members failed the applicable impact attenuation test (and because they failed a requirement relating to the placement of the "DOT" symbol), they contained an actual, material defect that made them unmerchantable *at the time of sale or delivery* and unfit for the ordinary purposes for which they were intended.  Am Compl. ¶ 47 (emphasis added).  Based on Plaintiff's allegations, any claim for the breach of these implied warranties occurred at the time of sale in July 2004.  Plaintiff filed suit in state court on April 2, 2009, more than four years after his purchase of the helmets.  Therefore, Plaintiff's claims for breach of the implied warranties of merchantability and fitness for a particular purpose are now untimely.

---

[42] Tenn. Code Ann. § 47-2-725.

[43] *Id.*

28

## CONCLUSION

The Court concludes that Plaintiff's state law tort claims arising from the labeling of Defendant's AF-50 motorcycle helmets are not pre-empted by the Federal Safety Act.  However, the Court holds that Plaintiff has failed to state a claim upon which relief may be granted as to all claims.  Therefore, Defendant's Motion to Dismiss is **GRANTED**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: December 1st, 2009.